UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
MONROE DIVISION

| | |
|---|---|
| **MARK POWELL LONDON AND** | **CIVIL ACTION NO. 3:14-cv-471** |
| **JUDY KAY LONDON** | |
| **VERSUS** | **MAGISTRATE JUDGE HAYES** |
| **ASSOCIATED PIPE LINE CONTRACTORS** | |

## MEMORANDUM RULING

Before the Court are two Motions for Summary Judgment, [doc. #s 30, 31], filed by Defendant Associated Pipe Line Contractors, Inc. Plaintiffs oppose the Motions. [doc. #s 36, 37]. With the consent of all parties, the District Court referred the above-captioned case to the undersigned Magistrate Judge for the conduct of all further proceedings and the entry of judgment.[1] For reasons assigned below, the Motions are **GRANTED**.

## Procedural History

Plaintiffs Mark and Judy London, husband and wife, first filed suit in the Fifth Judicial District Court, Parish of Richland, State of Louisiana, on February 4, 2014, and alleged that Defendant retaliated against them in response to Mark's workers' compensation claim. [doc. # 1-1]. Defendant removed the action to this Court on February 28, 2014, on the basis of diversity jurisdiction.[2] *Id.* On April 7, 2014, Plaintiffs amended their Complaint and alleged the following, in pertinent part:

> 5. On January 23rd, 2013, Petitioner Mark Powell London suffered an accident while working as Environmental Foreman for Defendant. His wife Petitioner Judy Kay

---

[1] *See* 28 U.S.C. § 636(c).

[2] Defendant also removed on the basis of federal question jurisdiction. Subsequently, however, Plaintiffs withdrew the federal claim that Defendant relied on for federal question jurisdiction. [doc. # 9].

>London worked for Defendant as Teamster, they worked for Defendant as a husband and wife team. He and his wife, Petitioner Judy Kay London, were laid off by Defendant.
>
>6. Petitioner filed a workers' compensation benefits claim against Defendant.
>
>7. On September 29th, 2013, Petitioner Mark Powell London returned to work as Environmental Foreman for Defendant at the previous compensation package, but Defendant refused to put Petitioner Judy Kay London back to work in retaliation for her husband filing a workers' compensation claim.
>
>8. Petitioner Mark Powell London worked for two weeks as Environmental Foreman until pay day, when instead of receiving the promised pay, Petitioner only received half of the agreed payment, in retaliation for having filed a workers' compensation claim.
>
>9. As a direct and proximate result of Defendant's conduct, Petitioners have suffered difference in wages promised and paid, loss of wages, benefits and earnings in the past; past mental anguish and emotional distress; anxiety; depression; embarrassment; costs and attorney's fees.
>
> * * *
>
>11. Petitioners were constructively discharged by Defendant in violation of La. R.S. 23:1361.

[doc. # 9, p. 1-2 (emphasis omitted)].

Defendant filed the instant Motions for Summary Judgment on December 3, 2014. [doc. #s 30, 31]. Defendant claims that there is no genuine dispute of material fact concerning whether Mark London was constructively discharged, whether Defendant retaliated against Mark and Judy, whether Defendant's refusal to rehire Judy was extreme and outrageous, whether Defendant desired to inflict severe emotional distress, and whether Defendant knew that Plaintiffs would suffer severe emotional distress as a result of its actions. [doc. #s 30-2; 31-2].[3]

---

[3] On May 28, 2014, the undersigned held that Judy London did not state a claim for retaliation because she was not within the class of persons protected by Section 23:1361, but that she did state a plausible claim for intentional infliction of emotional distress pursuant to LA. CIV. CODE ANN. art. 2315. [doc. # 25, p. 3-4].

Plaintiffs, as mentioned, oppose both Motions.

    The matter is now before the Court.

## Background

    Defendant hired Plaintiffs Mark and Judy London to work on a pipeline construction project in Shelocta, Pennsylvania in August of 2012.  [doc. #s 30-3, p. 10; 31-3, p. 8].  As a union member, Mark was subject to the collective bargaining agreement (the National Pipeline Agreement or, "the NPA"), between Defendant and the Laborers' International Union of North America.  [*See* doc. # 30-3, p. 2, 22].  Similarly, as a member of the Teamsters Union, Judy was subject to the NPA between Defendant and the International Brotherhood of Teamsters.  [doc. # 31-4, p. 2, 16].

    The record indicates that Defendant employs at least three classifications of workers: foremen, straws, and laborers.  According to Mark, laborers are paid pursuant to state-specific pay scales set forth in the NPA.  [doc. # 30-3, p. 3].  However, Defendant's project superintendents set the rates of pay for foremen and straws, and Defendant chooses whether to pay on an hourly or salaried basis.  *Id.* at 3, 4.  According to Judy London, foremen and straws can be paid at rate "A," the highest pay rate, rate "B," the median pay rate, or rate "C," the lowest pay rate ("straw pay").  [doc. # 30-4, p. 2].

    On January 23, 2013, Mark injured his shoulder while working for Defendant in Pennsylvania.  [doc. # 30-5, p. 5].  He reported the injury to Ryan Wilcox, Defendant's Vice President of Safety and Compliance, and Wilcox directed Mark to the on-site EMT for evaluation.  *Id.*  Mark testified that he did not feel any pain and that the EMT informed him that his shoulder was fine.  [doc. # 30-3, p. 12].  He also testified that Wilcox told him to take care of his shoulder and to keep him informed of any developments.  *Id.*

About two days after the injury, the Pennsylvania construction job ended and Defendant laid off most workers.[4]  *Id.*  Judy testified that Plaintiffs' layoff had nothing to do with Mark's injury or subsequent workers' compensation claim; rather, they asked for a layoff because they were "ready to go home."  [doc. # 30-4, p. 3].  A few days later, Mark called Wilcox and told him that his shoulder was hurting but he did not want to see a doctor because he was "concerned about [Defendant's] safety record."  [doc. # 30-3, p. 12].  Wilcox instructed Mark to go to the doctor if he needed to.[5]  *Id.*  Mark asked, "what about our safety record," and Wilcox responded, "I got a way to work around that . . . ."  *Id.*

Mark also stated that Wilcox was "upset."  *Id.*  He speculated that Wilcox could have been upset about "the safety record aspect of it," but he admitted that Wilcox never said anything to that effect.  *Id.*  Mark eventually saw a physician and received an MRI, and Wilcox paid for both visits with his company credit card.  [doc. # 30-5, p. 2, 6-7].  Wilcox avers that "[i]t is normal procedure for the company to take care of the cost of an injury itself without reporting it to the worker's compensation insurer where the nature and extent of the injury is not known," and that "if it appears that the injury is serious or will require more than minimal time to heal, [he] will report it to the insurer."  *Id.* at 2.  Subsequently, due to the MRI results and "[b]ecause of the potential for additional medical services needed," Wilcox "filed the injury" with Defendant's workers' compensation insurer.  *Id.* at 5.  Thereafter, Mark received workers'

---

[4] Mark testified that Defendant customarily laid off all workers after a pipeline construction job ended.  [doc. # 30-3, p. 5].

[5] Wilcox avers that he urged Mark to see a doctor.  [doc. # 30-5, p. 2].

compensation to his satisfaction.[6]  [doc. # 30-3, p. 14].

On April 13, 2013, Mark sent a text message to Sonny Weems, Defendant's project superintendent, and asked him if there was a restoration position available in Pennsylvania. *Id.* at 15.  Mark stated that he would have gone to Pennsylvania even if Defendant paid him straw pay (rate "C"). *Id.*  Mark did not travel to Pennsylvania. *Id.*  On September 12, 2013, Mark sent another text message to Weems and asked if there was a position available in Texas at a new pipeline construction site ("the Seaway Project"). *Id.* at 44.  The two then exchanged the following series of text messages:

> Mark: Sonny would it be safe to say that we would be called to come so that we can reserve a trailer spot[?] [C]indy said there would be one ready [S]unday.
>
> Weems: It might be a while before we get going I will see what I can do.
>
> Mark: Ok [S]onny if [you] can't work me in that's ok I understand thanks for talking to me today about it though please call me on [the] next one no matter what my position I [won't] let [you] down I will stay in touch thanks.
>
> Weems: Ok let me see what I can do I have already got someone for the envo[7] crew but I will be in touch with you.

*Id*. at 15, 44.

On September 24, 2013, Weems sent a message to Mark and offered him a position at straw pay: "I am going to put you running the Environmental crew it will be straw pay 2500 week no rain outs[.] You can hire one labor Ozone wants to come if that's who you want to work with." *Id.* at 44.  Mark accepted the same day: "Ok boss we [sic] be there this weekend thanks [S]onny I see u [sic] when we get there." *Id.* at 45.

---

[6] Defense counsel asked Mark if he received everything to which he was entitled and Mark responded, "Oh, yeah." [doc. # 30-3, p. 14].

[7] Mark testified that "envo" is an abbreviation for "environmental." *Id.* at 15.

5

However, Mark testified that, prior to traveling to the Seaway Project in Texas, he expected Weems to put him on the foreman pay scale because, "in between these texts," he spoke with Weems over the telephone and Weems told him to "come on over here . . . we'll get things lined out." *Id.* at 16.  Mark averred that, "in [his] mind," he thought Weems intended to pay him foreman pay.  *Id.*

Mark also testified that Weems spoke with Judy over the telephone and informed her that he "was going to find her a spot."  [doc. # 31-3, p. 14].  When defense counsel asked Mark why Weems never found a position for Judy, Mark stated, "I really can't answer that honestly and correctly either, because I don't know, other than the fact that they were retaliating against me and her . . . ."  *Id.*

Plaintiffs traveled to the Seaway Project around September 27, 2013.  [doc. # 30-3, p. 16].  When they arrived at the campground where some of the other employees were staying, Mark realized that the other workers were not speaking to him and that Weems was acting strangely.  *Id.* at 20.  He described the scenario as follows:

> "It just wasn't the same, I mean, I-you could-it was-you could tell just people were different in the office.  It was just a different atmosphere for me, unlike any other job I've ever been on.  We even got treated differently at the campground.  We were kind of outside of the so-called family.  Sonny didn't even speak to us the day we got there.

*Id.*  Judy added that Plaintiffs usually parked their trailer next to the other workers, but this time they were relegated to the back of the campground.  [doc. # 31-4, p. 14].

On either September 28 or 29, Plaintiffs confronted Weems about "some things that [were] being said . . . ."  [doc. # 30-3, p. 16].  According to Mark, Weems said, "let's get on the right-of-way, get your crew started and . . . when I add to your crew . . . I'll get your money

6

back." *Id.* at 17.  Mark did not elaborate on this statement in deposition; instead, he vaguely stated, "It's personal." *Id.* at 16.  Counsel for Defendant asked Mark to clarify the conversation with Weems, but Mark stated that it was personal, that he was "not going to speculate on it," and that it "in no way concern[ed] the case . . . ." *Id.* at 17.

In the same conversation, according to Judy, Weems reiterated that he would try to find a position for her. [doc. # 31-4, p. 11].  Judy stated that she subsequently checked with the Teamster steward "every day for four or five days straight" to see if he could find a position for her. *Id.*  She also spoke with an individual named Tommy Jones, who informed her that he would speak with Sonny Weems about a possible position as a parts runner. *Id.*  She stated that Tommy Jones "went over and spoke with Sonny about it and Sonny told him, 'hell no.'" *Id.*

On September 30, 2013, Mark met with Kimm Lambert, a timekeeper with Defendant, to sign a W-4 form. [doc. # 30-6, p. 1].  According to Lambert, "the information on the W-4 form comes from the employee . . . ." *Id.*  Knowing that he previously worked as an environmental foreman in Pennsylvania, Lambert asked Mark if he was going to work as an environmental foreman on the Seaway Project, and Mark said that he was. *Id.*  Thus, Lambert noted as much in Mark's W-4. *Id.*  However, Weems later informed her that "Mark was hired as a straw," and instructed her to change Mark's rate of pay accordingly. *Id.*  Lambert avers that she never spoke with Weems prior to meeting with Mark about his W-4, that she entered foreman pay on Mark's W-4 form based on what Mark told her, and that if she knew "that Mark was hired as a straw, [she] would have entered the rate for a straw in the system." *Id.*

Mark began work the same day and received his first pay check approximately two weeks later. [doc. # 30-3, p. 21].  When he looked at the check he realized that Defendant paid him

straw pay instead of foreman pay. *Id.*  He worked one more day, turned in his time sheet, "never said a word to anyone, [] walked out and got in [his] truck, [and] drove home . . . ." *Id.*  On October 15, 2013, Weems texted Mark and asked, "Hey Mark what's up with you and leaving[?]" *Id.* at 45.  Mark answered, "Sonny I hate that I didn't keep my word[,] things seemed to have changed[,] we will and I especially will always be grateful to u [sic] for helping us the way u [sic] did it's just not for me any more thanks Sonny love u [sic] man." *Id.*

## Law and Analysis

### I. Summary Judgment Standard

Summary judgment is appropriate when the evidence before a court shows "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).  A fact is "material" if proof of its existence or nonexistence would affect the outcome of the lawsuit under applicable law in the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute about a material fact is "genuine" if the evidence is such that a reasonable fact finder could render a verdict for the nonmoving party. *Id.*

"[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting *Anderson*, 477 U.S. at 247).  "The moving party may meet its burden to demonstrate the absence of a genuine issue of material fact by pointing out that the record contains no support for the non-moving party's claim." *Stahl v. Novartis Pharm. Corp.*, 283 F.3d 254, 263 (5th Cir. 2002).  Thereafter, if the non-movant is

unable to identify anything in the record to support its claim, summary judgment is appropriate. *Id*. "The court need consider only the cited materials, but it may consider other materials in the record." FED. R. CIV. P. 56(c)(3).[8]

In evaluating a motion for summary judgment, courts "may not make credibility determinations or weigh the evidence" and "must resolve all ambiguities and draw all permissible inferences in favor of the non-moving party." *Total E & P USA Inc. v. Kerr–McGee Oil and Gas Corp.*, 719 F.3d 424, 434 (5th Cir. 2013) (citations omitted). While courts will "resolve factual controversies in favor of the nonmoving party," an actual controversy exists only "when both parties have submitted evidence of contradictory facts." *Little v. Liquid Air. Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc). To rebut a properly supported motion for summary judgment, the opposing party must show, with "*significant* probative evidence," that a genuine issue of material fact exists. *Hamilton v. Segue Software, Inc.*, 232 F.3d 473, 477 (5th Cir. 2000) (emphasis added). "'If the evidence is merely colorable, or is not significantly probative,' summary judgment is appropriate." *Cutting Underwater Tech. USA, Inc. v. Eni U.S. Operating Co.*, 671 F.3d 512, 517 (5th Cir. 2012) (quoting *Anderson*, 477 U.S. at 248).

Relatedly, there can be no genuine dispute as to a material fact when a party fails "to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322-23. This is true "since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 323.

---

[8] However, Rule 56 does not require a court to "sift through the record in search of evidence to support a party's opposition to summary judgment." *Willis v. Cleco Corp.*, 749 F.3d 314, 317 (5th Cir. 2014) (quoted source omitted).

When a movant bears the burden of proof on an issue, it must establish "beyond peradventure[9] all of the essential elements of the claim . . . to warrant judgment in [its] favor." *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986). In other words, the movant must affirmatively establish its right to prevail as a matter of law. *Universal Sav. Ass'n v. McConnell*, 1993 WL 560271 (5th Cir. Dec. 29, 1993) (unpubl.).

**II. Retaliatory Discharge**

In its first Motion, Defendant argues, *inter alia*, that it is entitled to summary judgment on Mark's retaliatory discharge claim because there is no genuine dispute surrounding whether Mark was constructively discharged. [doc. # 30]. LA. REV. STAT. ANN. § 23:1361(B) provides, "No person shall discharge an employee from employment because of said employee having asserted a claim for benefits under the provisions of this Chapter or under the law of any state or of the United States." Thus, in order to maintain a cause of action for retaliatory discharge, an employee must establish (1) that he filed a workers' compensation claim, (2) that he was actually or constructively discharged, and (3) that he was fired because he filed the compensation claim.

To prove constructive discharge, "an employee must prove working conditions so difficult or unpleasant that a reasonable person placed in that position would have felt compelled to resign." *Bannister v. Dep't of Streets*, 666 So. 2d 641, 648 (La. 1996). In evaluating the intolerability of the working conditions, the Fifth Circuit considers "the following factors relevant, singly or in combination: (1) demotion; (2) reduction in salary; (3) reduction in job responsibilities; (4) reassignment to menial or degrading work; (5) reassignment to work under a younger supervisor; (6) badgering, harassment, or humiliation by the employer calculated to

---

[9] I.e., beyond doubt.

10

encourage the employee's resignation; or (7) offers of early retirement on terms that would make the employee worse off whether the offer was accepted or not."[10]  *Barrow v. New Orleans S.S. Ass'n*, 10 F.3d 292, 297 (5th Cir. 1994) (citing *Stephens v. C.I.T. Grp./Equip. Fin., Inc.*, 955 F.2d 1023, 1027 (5th Cir. 1992)).

Notably, the Fifth Circuit has also held that "[a]n employee who resigns without affording the employer a reasonable opportunity to address her concerns has not been constructively discharged." *Williams v. Barnhill's Buffet Inc.*, 290 Fed. App'x. 759, 762 (5th Cir. 2008) (citing *Woods v. Delta Beverage Grp., Inc.*, 274 F.3d 295, 301 (5th Cir. 2001) (holding that, as a matter of law, a reasonable employee would have reported sexual harassment before resigning)).  "An employee's obligation of reasonableness requires that she not jump to conclusions and not assume the worst." *Thompson v. Naphcare, Inc.*, 117 Fed. App'x 317, 324 (5th Cir. 2004).

In *Thomas v. Atmos Energy Corp.*, 223 Fed. App'x 369, 377 (5th Cir. 2007), for instance, the court held that a plaintiff who claimed that a coworker sexually harassed him did not suffer a constructive discharge because he did not remain at his place of employment long enough to see if the employer's investigation and subsequent remedial efforts would end the alleged harassment.  The court explained, "Thomas's precipitous resignation upon being informed of the results of Atmos's investigation was not the action of a reasonable employee." *Id.*  Similarly, in *Haley v. Alliance Compressor LLC*, 391 F.3d 644, 652 (5th Cir. 2004), the Fifth Circuit affirmed

---

[10] Louisiana courts consistently turn to federal precedent for guidance when considering claims of constructive discharge.  *See Plummer v. Marriott Corp.*, 654 So. 2d 843 (La. App. 4 Cir. 1995) (cited with approval by *King v. Phelps Dunbar, L.L.P.*, 743 So. 2d 181, 193 (La. 1999)); *Hare v. Paleo Data, Inc.*, 89 So. 3d 380, 386 (La. App. 4 Cir. 2012) (examining Louisiana's "Intentional discrimination in employment" statute and observing, "Because this statute is similar in scope to the federal anti-discrimination prohibitions in Title VII of the Civil Rights Act of 1964, 'Louisiana courts have routinely looked to the federal jurisprudence for guidance' . . . .").

summary judgment in favor of the employer because the former employee failed to attempt resolution of her concerns "before choosing to quit after just over two weeks back on the job."

Here, even assuming that Weems offered Mark an environmental foreman position at foreman pay, that Mark accepted the position, and that Defendant paid Mark straw pay, a reasonable jury could not find that Defendant constructively discharged Mark because Mark abruptly resigned without complaining about the payment discrepancy or otherwise giving Defendant an opportunity to address his concerns. Mark resigned the day after he received his first pay check. [doc. # 30-3, p. 21]. He testified that he "never said a word to anyone, [] walked out and got in [his] truck, [and] drove home . . . ." *Id.* Judy London testified that they did not speak with anyone before leaving.[11] [doc. # 3-4, p. 6]. She added, "I wouldn't have given them the satisfaction of letting them know they did anything to us." *Id.*

In addition, Weems texted Mark on October 15, 2013, and asked, "Hey Mark what's up with you and leaving[?]" [doc. # 30-3, p. 45]. Instead of raising his complaint with Weems, the individual with the discretion to set pay rates,[12] Mark responded, "Sonny I hate that I didn't keep my word[,] things seemed to have changed[,] we will and I especially will always be grateful to u [sic] for helping us the way u [sic] did it's just not for me any more thanks Sonny love u [sic] man." *Id.*

Mark argues, however, that he discussed his salary concerns with Weems on September 29, 2013, and Weems "made it very clear that he intended to get Mark his money back." [doc. #

---

[11] Kim Lambert avers that Mark entered her office on the day he quit and said, "I am out of here." [doc. # 30-6, p. 3]. She avers that Mark was angry because Defendant did not hire Judy. *Id.*

[12] [*See* doc. #s 30-5, p. 3; 30-3, p. 17].

36, p. 3]. This argument is unavailing. Preliminarily, it is not clear that Weems was referring to the monetary concerns that form the basis of Mark's present allegations. When defense counsel asked Mark what Weems was referring to, Mark cryptically stated, "It's personal." [doc. # 30-3, p. 16, 17]. Further, Mark intimated that Weems's statement "in no way concern[ed] the case . . . ." *Id.*

More importantly, and even resolving the aforementioned ambiguity in Plaintiffs' favor, Mark's September 29, 2013 conversation with Weems could not have afforded Defendant a reasonable opportunity to address the concerns underlying his constructive discharge allegation because the alleged incident that gave rise to the allegation—receiving straw pay instead of foreman pay—occurred *after* September 29, 2013, when he received his paycheck and realized that Defendant paid him less than it allegedly owed him.

Even construing all inferences in Mark's favor, a reasonable employee would not have felt compelled to resign without first contacting the employer and attempting to resolve the payment discrepancy. Accordingly, as a reasonable fact finder could not find that Mark was constructively discharged, Defendant is entitled to judgment as a matter of law on Mark's retaliatory discharge claim.

### III. Intentional Infliction of Emotional Distress

In their Amended Complaint, [doc. # 9], Plaintiffs alleged that Defendant intentionally chose not to hire Judy in retaliation for Mark's filing of a workers' compensation claim and that, as a result, they both suffered emotional distress. On May 28, 2014, the Court held that Plaintiffs plausibly stated claims for intentional infliction of emotional distress. [doc. # 25, p. 3-4]. In its second Motion for Summary Judgment, Defendant contends that it is entitled to judgment on

13

these claims. [doc. # 31].

To establish intentional infliction of emotional distress ("IIED"), a plaintiff must prove: "(i) that the conduct of the defendant was extreme and outrageous, (ii) that the emotional distress suffered by the plaintiff was severe, and (iii) that the defendant desired to inflict severe emotional distress or knew that severe emotional distress would be certain or substantially certain to result from his conduct." *Sullivan v. Park*, 2014 WL 6982458, at *5 (La. App. 4 Cir. Dec. 10, 2014) (citing *White v. Monsanto Co.*, 585 So. 2d 1205, 1209 (La. 1991)). "The conduct must be so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community. Liability does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities. " *Monsanto*, 585 So. 2d at 1209.

Here, even assuming that Defendant did choose not to hire Judy in retaliation for Mark's claim, Plaintiffs still fail to establish both the first and second elements of their IIED claims.[13] To begin with, Plaintiffs fail to adduce any competent summary judgment evidence that demonstrates they suffered severe emotional distress. To prevail on an IIED claim, a plaintiff must establish that she suffered distress "that no reasonable person could be expected to endure .

---

[13] Defendant argues that the conduct of the employees at the campground prior to Mark's first day on the job, as well as Weems' subsequent refusal to find Judy a position, did not reach the level of extreme and outrageous behavior necessary to sustain a claim of IIED. [doc. # 31-2, p. 14]. To reiterate, when Plaintiffs arrived at the campground, the other workers did not speak to them, Weems acted strangely, and Plaintiffs were relegated to the back of the campground. In addition, according to Judy, Tommy Jones spoke with Weems about finding her a position and Weems stated, "hell no." Defendant is correct in that these actions are not so extreme in degree as to go beyond all possible bounds of decency. *See Monsanto*, 585 So. 2d at 1209 (holding that liability does not extend to petty oppressions or trivialities and that persons must be expected to be hardened to occasional inconsiderate and unkind acts). However, Defendant's argument is ultimately inapposite because Plaintiffs' IIED claims are solely predicated on Defendant's refusal to rehire Judy.

14

. . ." *Monsanto*, 585 So. 2d at 1210. "Liability arises only where the mental suffering or anguish is extreme." *Id.* Here, Plaintiffs fail to come forth with any evidence that they sought mental health treatment, that they are receiving counseling, that they are taking medication for anxiety or depression, that they suffered physical symptoms associated with severe emotional distress such as weight loss or significant loss of sleep, or any other evidence detailing the actual distress they suffered. Consequently, no reasonable jury could find that Plaintiffs suffered severe emotional distress.[14]

In addition, Defendant's alleged retaliatory failure to hire does not amount to extreme and outrageous conduct.[15] In *Stewart v. Parish of Jefferson*, 668 So. 2d 1292, (La. App. 5 Cir. 1996), for example, the court held that the plaintiff did not demonstrate extreme and outrageous conduct even where his supervisor harassed him for two years, questioned his personal life, increased his workload, and pressured him to accept a demotion that ultimately led to his termination. In *Glenn v. Boy Scouts of Am.*, 977 F. Supp. 786 (W.D. La. 1997), the court held that an employer's actions did not constitute extreme and outrageous conduct even where a supervisor told the

---

[14] Mark testified that he was embarrassed when everyone on the job site asked him why Judy was not working. [doc. # 31-3, p. 13]. He also testified that he "was humiliated beyond belief" when he received his paycheck. [doc. # 30-3, p. 18]. These statements do not describe the kind of extreme mental anguish which no person could be expected to endure. *See Smith v. Amedisys Inc.*, 298 F.3d 434, 449-50 (5th Cir. 2002) (holding that although the plaintiff alleged she was "angry, embarrassed, disgusted, humiliated, horrified, and repulsed," and that she experienced "depression, headaches, and loss of appetite," she did not suffer "unendurable" distress).

[15] As mentioned, the Court previously held that Plaintiffs stated plausible claims for IIED based in part on *Portie v. Devall Towing & Boat Serv., Inc.*, 637 So. 2d 1061 (La. 1994), which recognized that an employee may bring a claim for IIED when "the employer's *intentional* conduct involves the retaliatory discharge of [the] employee's close relative." [doc. # 25, p. 3-4]. Here, however, the circumstances surrounding Defendant's failure to hire, as supported by the evidence, clearly demonstrate that Defendant's alleged conduct was not extreme and outrageous.

employee that it was rumored she had a sexual affair with a previous executive, that she was a "very sexual person," that she was "sending out sexual vibes," that he did not want a woman in her position, that she was a "total disgrace," and that she would be terminated unless she voluntarily resigned.

Similarly, in *Trahan v. Bellsouth Telecomm., Inc.*, 71 F.3d 876 (5th Cir. 1995), the Fifth Circuit held that an employee failed to establish facts sufficient to constitute IIED where the employer used a security team to tease, ridicule, and taunt the employee for over seven hours. In *Washington v. Mother Works, Inc.*, 197 F. Supp. 2d 569 (E.D. La. 2002), the court ruled that allegations of repeated racial slurs, ridicule for missing work to treat a sick relative, and racially motivated termination did not rise to the level of extreme and outrageous conduct. Finally, in *Smith v. Ouachita Parish Sch. Bd.*, 702 So. 2d 727 (La. App. 2 Cir. 1997), the court found that a school board's actions were not extreme and outrageous even when it violated an employee's "statutory and due process rights and caused her emotional and psychological distress by demoting her . . . ."

Here, Defendant's alleged refusal to hire Judy was less egregious than the actions of the aforementioned employers. It is important to note that Defendant did not discharge Judy, it simply chose not to re-hire her.[16] While certainly condemnable, Defendant's alleged retaliatory employment decision was not so extreme and outrageous as to be characterized as atrocious and

---

[16] Plaintiffs argue that the Louisiana Supreme Court, in *Portie*, 637 So. 2d at 1061, made "it illegal for an employer to engage in intentional conduct involving the retaliatory discharge of an employee's close relative." [doc. # 37, p. 3]. As noted, however, Defendant did not discharge Judy. Moreover, illegal conduct is not synonymous with extreme and outrageous conduct. *See Nicholas v. Allstate Ins. Co.*, 765 So. 2d 1017, 1025 (La. 2000) ("Conduct which is merely tortuous [sic] or illegal does not rise to the level of being extreme and outrageous."). Courts require "truly outrageous conduct before allowing a claim of [IIED] even to be presented to a jury." *Id.*

utterly intolerable in a civilized community. *See Fletcher v. Wendelta, Inc.*, 999 So. 2d 1223, 1229 (La. App. 2 Cir. 2009) ("It is not enough that the defendant acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by "malice" or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort.").

## Conclusion

For the foregoing reasons, the Court finds that the record, taken as a whole, could not lead a rational trier of fact to find for Plaintiff Mark London on his retaliatory discharge claim or to find for both Plaintiffs on their intentional infliction of emotional distress claims. There is no genuine dispute as to any material fact and Defendant is entitled to judgment as a matter of law.

Accordingly, **IT IS ORDERED** that the Motions for Summary Judgment, [doc. #s 30, 31], filed by Defendant Associated Pipe Line Contractors, Inc. are hereby **GRANTED**. Judgment shall issue dismissing Plaintiffs' claims with prejudice at Plaintiffs' cost.

In Chambers, at Monroe, Louisiana, this 10th day of February, 2015.

_____
KAREN L. HAYES
UNITED STATES MAGISTRATE JUDGE